23-2193. Council, when you're ready. Good morning and may it please the court. Council. Page message for the United States. It's actually coming through pretty good. Okay. Yeah. I was hearing a little bit of a ringing. Maybe that's just me. I would like to reserve a couple of minutes for rebuttal. The United States has brought this appeal today because the district court erred in excluding three critical categories of evidence from the murder trial of Santiago Martinez for the death of his longtime girlfriend, Deanna Suazo. I'd like to touch on all three of these issues of exclusion today, and I'll turn first to the confession. The district court first clearly erred in its characterization of the post-polygraph interview. If you put on the interview recording, expecting to hear over three hours of unrelentingly aggressive and accusatory interrogation, beginning with a barrage of accusatory and aggressive questioning as soon as the polygraph is complete, which are the findings that the district court made, you are going to wonder by the end if you have put on the right recording. Would you count that as a finding of fact the district court made? Yes, I would. I mean, it's a characterization of the facts, but I think it's a fact about the interrogation the district court has found. I mean, if you don't believe they're facts, then I suppose that you could characterize it however you want, but we do believe that those are facts that are clearly erroneous. And to start with the most basic point, the questioning of Mr. Martinez ended at two hours and 22 minutes. This is an area of law in which duration matters, and two hours and 22 minutes is not the same thing as over three hours. And then turning to the nature of the questioning, Agent Coyle doesn't harass Mr. Martinez. She doesn't yell at him. She doesn't insult his intelligence or his character. She doesn't call him a liar. In fact, she praises him. She speaks calmly and quietly for almost two hours before we reach that four-minute period where her tone becomes sharp and she uses coarse language. Now, that's an important moment. It's reasonable to note that it happened, but what is not reasonable is to assert that that tone is characteristic of the entire interview. I mean, does it really matter? So whether you're clever or aggressive, does it really matter which one you use if it's continual and unrelenting pressing to get what you want? Because I listened to this, and I will admit I did not listen to two hours and 20-something minutes. I listened to it in about six-minute intervals just to see what I was hearing. But I did hear somebody who was continuously and although very nice, strongly suggesting things to the person being interviewed. And I just wonder if that, why it matters. I mean, as compared to Pena, for example, where the officers were getting up in his face and yelling at him and being much more aggressive. I mean, there are two approaches calculated to do the same thing and in an unrelenting fashion. I think that it does matter. Degrees matter. I think that you don't have to reach our clear error issue. You don't have to find that any clear error occurred in order to reverse the district court here. But I think it does make a difference whether you have two hours of unrelentingly polite and gentle questioning, even if that person is persistent. That's different than somebody who's getting yelled at for two or three hours on end. But even those cases like in Pena where there is very much more aggressive and accusatory questioning, the court has not found that that renders the statement involuntary or the waiver unknowing. How do you think Pena, I mean, Pena is relatively new, came out after the briefing in this case. How do you think Pena impacts our decision in this case? Well, I think Pena is extremely persuasive authority on the voluntariness question. So in Pena, that defendant, as you mentioned, had somebody in his face pointing a finger at him, yelling at him. It just being a lot more aggressive and accusatory than we have here. And the court found that that statement was voluntary. I just don't think it is possible to look at the facts of Pena and compare them to the facts of the case here and come to the conclusion that this statement was involuntary. Well, but can I maybe recharacterize what Judge Carson's asking you? It seems to me the agent here engaged in a lot of psychological manipulation. Some of the techniques utilized sound very familiar to me in the school, the John L. Reed techniques. How have courts evaluated that type of psychological manipulation when weighing it for voluntariness? The court actually in Pena did evaluate a similar kind of encouragement, I could say, and said that just because a technique is calculated to elicit a confession does not make it prohibited by the Fifth Amendment. Confessions are an unmitigated good under the case law. And so just because somebody is using a technique, whether it be a moral persuasion, whether it be appealing to the suspect's ties to the community, or the opinion of his family, or the feelings of the victim's family, these kind of things, they may persuade someone to confess. But they are not impermissible tactics to do so. And I don't think that anything that Agent Coyle here did approaches an impermissible tactic. She didn't lie, she didn't threaten, she didn't physically abuse him, she didn't deprive him of necessities, none of those sorts of things. If empathy and this sort of gentle, nice treatment and affirming that he is a good person who's going to do the right thing in the end, if that sort of thing is coercive, then I would say that nearly every interrogation that court faces would be held coercive. And that's simply not the case. The cases where a statement has been held to be coerced are starkly different than this sort of facts. Can I ask you about the texts? Of course. So you have this group of texts. And the idea, I guess, from an evidentiary standpoint, is you want to put them in to show that she's been trying to break up with him for a long time, and he's been unaccepting of that. Is that fair? I think to show that he knows that she has communicated an intention to end the relationship, and the general response in the text is not enthusiasm on his part for this idea. I mean, the general response is largely nothing in his. It's like, let's talk about it later. That doesn't happen. He doesn't say, no, I don't want to break up. He just basically ignores them. And don't, for your theory, I mean, don't you really need a response from him that indicates, I'm never going to let you go. I'm going to, you know, you can't break up with me. We've got to be together, or some kind of hostile response. Don't you really need something like that for your text to come in? No, I don't think so. He does say a couple of times, I'm sorry. He never says, absolutely, you're right, this has gone on too long. Like, I'm done with you two. Well, he doesn't want to break up. Right. He doesn't want her to leave. You can tell that from the text messages, and that's an important part of the government's theory, is that he killed her in a fight because she was trying to leave him, and he did not want that. As you can tell from some of his verbal responses in the text. But I don't believe that we have to have him verbalizing all of his feelings in these text messages. You can tell that there's conversations that are happening offline, right, that are not happening in the text messages, because sometimes the message will be, like, we're breaking up, and then the next one from him is, you know, hours or days later, and he's like, see you soon. I mean, so you can tell there's stuff going on. Are you trying to show with the text, there are a couple of possibilities. Number one, he's so angry that she was going to break up with him that he's made up his mind he's going to kill her that night, even though she made dinner and they had a long evening and everything else. Or the texts show that most likely what happened is they started their evening just fine, and then she said she's going to break up, which enraged him and he killed her. I think our theory is more along the lines of the second. Yeah, and that's not really, when I look at the text, that's a big stretch to say that these texts, which had sparked no controversy, no violence, no foul language, so far as I saw, that those mean that, well, they must have had a fatal confrontation that night about something we have no idea whether it was even discussed because of these previous texts, but she had said that night, I'm breaking up with you, and he thought, oh, for real this time. Well, things got out of control and he killed her. We actually do have evidence that they fought that night, and we know what they fought about, although that does come through his confession. So these text messages are more important if we don't have that confession, but we actually do the note that they fought that night about breaking up, and he did not want that, and things got out of control. We heard that from his own mouth. But I think more basically, these messages show that Mr. Martinez has received several messages from his long-term girlfriend of a decade saying, I want out of this relationship, this isn't going anywhere, I'm unhappy, you're unfaithful, you're an alcoholic, all of this stuff, and those are the kind of things that stick with somebody. You don't forget that your partner of a decade has said these things to you, and even if you paper over the problems and you keep going, all of that lurks in a person's mind. Give me a precedent that you have that admits something like this, where you have some emails, you have some texts, something like that, that basically have no response. I don't think, we don't have anything in the context of ending a relationship, but a lot of the cases that we have cited... Or just in another case where you don't have any, what's bothering me especially is you don't have anything on the other end to show that this is a real problem. So many of the cases that we cited, for instance, the one about the defendant who believed that the victim was a government informant, right, a lot of these statements, or the statement is admitted to show what the defendant thought. There's no corresponding statement where the defendant ever says, this is what I think, right? So that informant case, the defendant doesn't say to my recollection, oh, yeah, I believe that victim is a government informant, and now I'm going to kill him. We never have in these cases, or certainly not most of them, an explicit verbalization by the defendant. You know, the name of the doctrine is effect on the listener, not immediate verbalized response of the listener. Well, you have to have something to show the effect, though, don't you? He killed her, right? I mean, that is essentially, the government's theory is that he's expressing part of the effect of these perpetual breakup messages by resorting to violence. But you've got to tie them together. Well, I think that's a question for the jury. The jury could definitely say, you know what, this is too long, or he never said anything in the text message. I think he just forgot these. I don't think it meant anything to him. I think he just ignored it. The jury should be allowed to take that. But that's true with every kind of attenuated evidence. I mean, there's a lot of evidence that we say, no, no, look, that is so thin. There is so little relevance. We're not going to let that in. But we could say, well, you know what, we're going to go, even though this seems irrelevant to me, we're going to go ahead and let it in and let the jury decide. I mean, then the jury's got a bunch of irrelevant things, things that might not mean anything in the end game. If the district court didn't think that we had met the 104 standard for conditional relevance, it could have excluded the text messages on that theory. That's not what it did. It excluded them as hearsay, as asserted for the truth, as introduced for the truth of the matter asserted. That's a district court basis of decision. That is wrong, because these messages are not being introduced for their truth. At this very basic level, these are just not hearsay, and that was the exclusionary ground the district court gave. Counsel, I know you're guarding your time, but can I go back to the post-polygraph statements? Yes. Can you help us understand the government's position on what factors would be most important under, you know, looking at fields in that case to see, you know, what were the change in circumstances? I know what the district court said and relied upon, but what's the government's view on what were the most important factors we should consider if we're going to articulate a post-fields test? So I wouldn't suggest that the court needs to come up with any new framework. Fields is asking, are the statements still voluntary? Are the statements, is the waiver still knowing and intelligent? And there are very established bodies of case law on both of those questions. So I wouldn't suggest the court has to come up with anything new here. So I would essentially apply those two established bodies of law with a focus on whether anything has changed since the, you know, signing of the waiver form or since the explicit waiver. You know, waiver takes many forms. It doesn't have to be explicit, but if you've already determined that at the beginning when the form was signed, everything was fine, then it's a very sensible shortcut to ask, well, what has changed? So I would suggest you apply those two frameworks with an emphasis on anything that's changed. I'd like to reserve the remaining time for rebuttal. Violet Edelman for Santiago Martinez. In its briefing and here today, the government is trying to distract this court from the totality of the circumstances relevant to the waiver question. In reality, the government has not offered a single compelling justification for disturbing the district court's soundly reasoned and fully supported conclusion that, as the district court put it, the moment special agent Coyle's post-test questioning began, the prevailing legal standard requiring rewarning was met. That is, the circumstances had changed so seriously that Mr. Martinez was no longer making a knowing and intelligent relinquishment of rights. Had they really changed that much? It seems to me that what happened here is he received his Miranda warning, signed the form, and the nature of the Miranda warning is, listen, we're going to give you this polygraph, and then afterward, we're going to go over the results and talk about it. And that the nature of the questioning, at least as it began, was talking to him about the fact that he had failed the polygraph. Isn't that within the warning? That's not exactly what happened here. In the six-plus-hour ordeal that Mr. Martinez underwent, these are the facts that the district court found in support. He was young, had no experience with the justice system, and was not represented by counsel. They sought him out at the Pueblo unannounced, led him and his parents off the Pueblo to a police department, talked to them briefly, and then sent his parents out of the room where they gathered he was in a state of extreme emotional distress, and then asked if he would take a polygraph exam to quickly clear his name. Okay, now, he had mentioned to them before that he was willing to take a polygraph, right? That's true, that was a week before, but he didn't initiate this encounter, which is more how it appears in some of these other cases. And we say he's young, but he was like 28 years old, if I remember correctly. All of these factors go to the question whether, I think the way Fields frames it is, it was reasonable to expect that there would be post-test questioning. And so the district court made an observation in a factual finding about him, based on its experience with him and the other facts in the record, that that contributed to that he wasn't someone who would expect, based on the way this waiver was given to him, that it would apply to a post-test interrogation. Specifically because the rights themselves were given, actually the district court said simultaneously. It was on an iPad, it was one after the other within one minute. Here's your Miranda waiver, now you're taking a polygraph test. And then she groomed him basically for two hours, unrecorded, to take that test. So there's this mounting expectation that he's taking a test, this is about a polygraph test. It's three hours total of time when he was in the police department, getting ready and being prepared to take a test, that was presented in one light to him. And so the district court made a slew of findings, all in support of this, which is unquestionably relevant to the analysis here. Because when you're looking in the context, in the Miranda context, the background experience and conduct of the accused is always relevant. That's a question we always look at. But when you have a polygraph situation, where there is a once valid waiver of rights, then we have to look at what that waiver said and what the person would have understood about that waiver and how it was presented and then what happened in the time that went by after, how much time went by. And then the way that the agent approached the person after the test and the way that they conducted the questioning. But really the turning point for the district court was the moment when she ended the test and said, all right, you failed or you didn't pass the test. Now we need to talk about what happened. There's no case where there's mandatory language like that and re-warning has not been required. And the other piece is that- Well, counsel, but isn't it also true there's no case where a warning has been required? Well, there was- We have a test from fields. No, but you just said there was no case that at the point in time where the polygraph stopped, that there's no case that tells us that a warning is not required. But I would say, at least from my review of the briefs, the contrary is true as well. And what we're doing here is applying a fields test to look at whether the circumstances have changed and then analyzing whether or not a re-warning was appropriate. But there's no hardline rules on this, right? Well, there's no hardline rule, but there are circuit court cases where re-warning was required in the Ninth Circuit and the First Circuit. Based upon the change in circumstances? Yes. If you remove this out of the polygraph context, you mentioned there's ways to analyze statements, there's technical compliance with Miranda, but then just general voluntariness. Are you conceding or contesting the factors that we have applied in cases about voluntariness generally? And you've discussed some of them already. Are you making an argument that his statements would not be voluntary as a separate argument compared to just he needed to be warned again after the polygraph test? That is a separate argument that I have made and stand by it. It's not dispositive because on the waiver issue, the district court's decision was sound and supported and there's no reason to reverse it, and so this court doesn't need to reach that issue in this case. But a lot of the findings that she made and, in fact, the way she phrased her holding do support a conclusion that the statements also weren't voluntary. And, of course, they are overlapping inquiries, but they're not controlling the voluntariness question because it's a different analysis. And so that's why Pena has limited application to this case. And even if you want to look at the coercion and the question of coercion and voluntariness alone, all of the things that I just laid out about the situation that made it coercive leading up to the change in circumstances also inform that, too, and make it different than Pena. But the central issue in all of the briefing of this case and in the district court's decision was about whether the waiver that he signed before he took the test applies to his post-polygraph interrogation. And what the district court did, even though now the government really tries to drill down on the factors and exclude most of the ones that the district court considered, it looked at these factors that are articulations of the totality, and that is unquestionably relevant. So if we have, maybe it would take issue with some of the factors that the district court found most important. For example, the district court found that, I think, Agent Coyle switched from her role, I think this was as it was described, from a neutral test administrator to an interrogator. Well, let's say I disagree and say she was never neutral, and I would disagree with that finding. If we're looking at the totality, what other factors would you say beyond just what the five that the district court really focused on that you think are important for us to consider as well? Well, I don't think it boils down to a list of factors. I think all of these circuit courts have sort of looked at different facts and maybe characterized that. Sure, so what are the facts of your client or this circumstance that you would stress that we really take a look at? Right. It is the progression and what was conveyed to him from the beginning of the encounter through to the end of the test, and then the shift after the test into this. Now, what it really amounted to was he was being treated like someone who was innocent until proven guilty, and then after the test suddenly it's you're guilty, now you're presumed guilty, you have to explain what happened. And that was the way she then conducted the interrogation. Whatever her tone was, that's what she was doing. And that's not dispositive to the question of whether he needed to be rewarned because the turning point was really as soon as she demanded an answer at the end of the test. But it confirms and compounds that conclusion. Do you agree with the district court's description of the manner in which the interrogation took place? Well, I think first the characterization of the interrogation as accusatory is definitely, I mean, even Agent Cobb called it highly accusatory. And I think because she repeatedly said, you know, you're not telling me what actually happened, suggesting that he was lying, that is sort of by definition accusatory. Aggressive? I mean, the government seems to assume that in order to be aggressive it had to be violent, which I don't agree with. I think she was aggressive in her pursuit of the statements. Unrelentingly aggressive. It was unrelenting. She was finding different ways throughout the entire course to push him and find emotional access points for him. But, again, this, you know, maybe even if this court thinks that it was a stretch or an exaggeration at the point in the opinion where she framed it that way because she talked about this interview in various shades for pages, the district court. And there's one spot, I think, where it says that, unrelentingly aggressive and accusatory. That wasn't central to the finding because she located the shift. The moment he disconnected the test, began reporting and employed mandatory language conveying that because he had not passed the test, he had no choice but to continue answering her questions. Have you come across a case, and you have to get past your Miranda issue to answer my question, so we're going to assume, you're just going to assume that for purposes of my question, that the Miranda warning was good. Have you come across a case where this type of soft-spoken but very persistent type of questioning resulted in a finding that a confession was not voluntary? No, I don't think so. But I will say that Miranda itself talks about the coercive nature of these psychological tactics, the Reid method that was discussed earlier. And it is true that recently the kind of physical violence that you used to see in interrogations isn't something that officers do anymore. That doesn't mean that they aren't overbearing someone's will, which is really the guiding standard, by using psychologically coercive methods. Okay. Can I ask you about the prior acts, since time's running low? Yes. Is the example in Comanche the hypothetical dicta? Because that case obviously did not involve the same facts as it are, well, the same situation with the wife. Well, I don't think it's dicta. But I think the most important thing that Comanche says that we accept is that when 404B evidence is being introduced and its purpose requires an inference based on propensity, then it's improper. And so no matter what the purpose the government articulates is, if it requires a propensity inference, then it's invisible. And the chain of inferences that the government sets out in its briefing all are just ways of talking about propensity evidence. So dicta or not, I don't think it's controlling. But certainly Comanche was laying out how its holding applied to a circumstance like this one. And so I think it makes it pretty easy. I would like to address the text messages if I can. So there is no case where statements like this have been introduced for their effect on the listener, where it's an accumulative effect, distinct from the effect that seems to be proven in real time and based upon a chain of inferences again. The government characterizes the non-hearsay purpose in a way that is actually just rife with inferences that each one requires a leap. At one point I count four such inferences. The government says the jury might reasonably infer it's the sort of thing that one remembers. That's an inference. It's the sort of thing that might make someone feel insecure. There's an inference. And it's the sort of thing that could make an insecure person resort to violence. So there's this multi-step kind of process you have to go to to extrapolate from these messages the purpose that the government is saying it wants to introduce the messages for. And that is not what the effect on the listener exception is for. The effect on the listener applies when there's a direct causal effect. And so the messages or the statements spur someone into action and they do something that can only be explained by introducing this statement. That's not what these messages are. These messages are about the truth of the matter asserted, which is that she was trying to break up with him. And so there's no way to get the messages in under that exception. I'm going to give you a couple extra minutes, so don't rush that past. If you have something you want to address, because I'm going to give opposing counsel a couple of minutes on rebuttal. Okay. Well, are there any further questions? I'm sure I can come up with some. Go ahead if you have something else you want to say in response to this. Oh, I think that's pretty much it. Do you have any example? I mean, you heard what I was telling your opposing counsel. It strikes me that a problem with these messages is we can't look at them and tell what the effect on the listener is. We look at these, and there's seemingly no effect on the listener. The listener says nothing in return. And, I mean, are you aware of text messages or e-mails or communications where someone throws out a, I'm going to break up with you, or whatever the case may be, and the response is nothing, and then they're admitted to show the effect on the listener? I'm not aware of a case like that, and I would point to there's a Tenth Circuit case where I think this court said at one point the effect is obvious. And so that's, oh, no, that was a Seventh Circuit case, but the inference is obvious. So here it's not obvious because you can tell the government is sort of a way to articulate the effect. Well, why isn't it obvious? Isn't it the point that it goes to that there was volatility in their relationship? Well, but that isn't an effect on the listener, the point of volatility in a relationship. That's an inference about the nature of their relationship, which depends on the statements being true, because it's that she was breaking up with him rather than them causing him to do something. The effect on the listener is a very finite exception, and it just doesn't work here. And for those reasons we ask that if there are no further questions, that the district court's well-reasoned conclusions be affirmed. Thank you. Counsel, you have a couple of minutes. I appreciate it, Your Honor. I'd like to just pick up with Judge Federico's question about, doesn't it go to the volatility in the text messages of their relationship? And I do think it goes to the volatility of their relationship and that he knows it. Importantly, he knows this relationship is not hunky-dory. He knows that it's not just a case of, he knows that his longtime girlfriend has told him like 10 times, we're done. He tells the investigators on the day of her death. Which seems to cut the other way. In other words, oh, as usual, another email saying that we're breaking up, as though he's not going to believe that it's for real, it's just something that they do. I mean, probably the eighth time you hear this and you haven't broken up, you're not going to give it as much credence. I totally understand that. But a relationship in which somebody is saying over and over, we're done, I'm not happy, you're an unfaithful alcoholic, all of this stuff. That's not a relationship with no issues. That's what he told the FBI on the morning that they arrived at the scene. He knows he is saying something that he cannot personally believe to be true. He knows this is not a relationship with no issues. This is up and down drama all the time. So he knows that if for no other reason than because of these messages that she had sent him. That was a purpose that the government identified, and it's not the matter asserted in the text messages. I mean, isn't it just a different way of saying what's asserted in the text messages? Listen, she's told him multiple times she was going to break up with him. Wait, we're not offering it for the truth. We're offering to show it that they had a volatile relationship. I mean, sort of what's the difference? If it wasn't volatile, she wouldn't be threatening to break up with him. I mean, it's just one signal. You know, they're both the signal of the same thing. A lot of these hearsay issues are pretty nuanced in what the truth asserted is and what the purpose is. But here, let's not even take the breakup ones. Let's take the ones where she says, you've cheated on me. You can't handle your drink. Those are assertions, and we don't care if they're true. We care that he knows she has accused him of these things. And a person who knows that cannot truthfully tell the FBI, this is a relationship with no issues. We were just fine. Any further questions? All right. Thank you, Counsel. Thank you, Your Honors. Thank you both for your arguments. The case is submitted, and Counsel are excused.